IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

YELENA MAZUR,                                    Civ. No. 6:23-cv-0969-AA

                    Plaintiff,              **OPINION & ORDER**

        vs.

KAISER FOUNDATION HOSPITALS,

                    Defendant.
_____

AIKEN, District Judge:

Plaintiff Yelena Mazur brings this action against her employer, Kaiser Foundation Hospitals, ("Kaiser"), alleging breach of her Collective Bargaining Agreement; violation of Oregon Whistleblower Law, ORS 659A.199; and Intentional Infliction of Emotional Distress. *See* Second Am. Compl. ("SAC"), ECF No. 1-5. Before the Court is Defendant's Motion for Summary Judgment, ECF No. 13, which is GRANTED for the reasons explained below. The case is DISMISSED.

LEGAL STANDARD

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In judging evidence at the summary judgment stage, "the court does

not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Rather, it must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001).

If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Celotex*, 477 U.S. at 324. "When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325)).

## BACKGROUND

Plaintiff has worked at Kaiser since 2001. From 2001–2019, Plaintiff was an "Imaging Assistant." Shaddy-Farnsworth Decl., Ex. 1, Pl. Dep. 16:15–24, ECF No. 14-1. In 2019, Plaintiff was promoted to Electrocardiogram Tech Team Lead ("EKG Team Lead") at Defendant's Salem hospital. Pl. Dep 22:22–23:02. As EKG Team Lead, Plaintiff supervised four full-time employees and one on-call employee, Pl. Dep. 27:08–19, and performed EKG's, managed the EKG schedule, scheduled employee vacations and training, and made "sure the department r[an] smoothly." Pl. Dep. 26:04–22. Throughout her Kaiser employment, Plaintiff has been a member of the United Food and Commercial Workers Union Local 555 (the "Union") and was

covered by a Collective Bargaining Agreement ("CBA").  Pl. Dep. 20:25–21:08; *see also* Shaddy-Farnsworth Decl., Ex. 1, CBA, ECF No. 14-1.

On February 17, 2022, Plaintiff met with her manager, Ms. Ruiz, and others to report concerns about staffing and patient care deficiencies.    SAC ¶¶ 5–6; Ruiz Decl. ¶ 6, ECF No. 15.  Plaintiff reported that there was a "discrepancy between care Kaiser provided patients and the standard of care it had in place for patients[,]" SAC ¶ 5; that "it took the EKG Tech 25 minutes to arrive and perform an EKG . . . when the [expected] response time [was] 5 minutes," SAC ¶ 6; that EKGs were otherwise "not done on time" due to understaffing or the notes were incorrect due to clerical errors, Pl. Dep. 81:12–82:24; that "managers were pressuring employees to work without lunches[,]" SAC ¶ 8, or allowing employees to skip lunch, Pl. Dep. 89:14– 90:10; and that "employees were asleep during their shift while on the clock," SAC ¶ 9; Pl. Dep. 93:07–11.

On March 3, 2022, Ms. Ruiz gave Plaintiff her 2021 performance review.  SAC ¶ 10; Ruiz Decl. ¶ 8; *see* Ruiz Decl., Ex. 3, 2021 Performance Review, ECF No. 15-3. Plaintiff received an overall evaluation of "Successful," which Plaintiff alleges "was the wors[t] evaluation she had received at Kaiser."  Pl. Resp. at 7, ECF No. 20.  Ms. Ruiz testified that in the performance review, she "noted several areas of improvement[,]" including that "[Plaintiff] had been reluctant to assist with [File Room] coverage . . . and that she needed to improve her communication and collaboration with others in the department."  Ruiz Decl. ¶ 8.

At some time in March, Kaiser decided to restructure the Imaging Services Department by combining the EKG Group with the Imaging Film Library Group ("File Group"). Ruiz Decl. 12. Ms. Ruiz testified that she "determined that there was no longer a need for two Team Leads in the department" and that she chose Ms. Canton, the File Group Team Lead, for the Lead position because, "[u]nlike [Plaintiff], Ms. Canton was trained in both EKG and file room duties[.]" Ruiz Decl. ¶ 12.

Plaintiff alleges that, on March 31, Ms. Ruiz told Plaintiff that "her [EKG Team Lead] position was being eliminated[]" because it "was no longer needed since the EKG group did not have [five] employees and . . . the Union Contract required [five] employees to warrant a Team Lead." SAC ¶ 12.

On March 31, Plaintiff "requested her bumping rights," SAC ¶ 13, which would allow her to "choose any imaging assistant position" from a less senior employee, Pl. Dep. 140:18–20; Ruiz. Decl. ¶ 13. Ms. Ruiz testified that she explained to Plaintiff that "bumping rights do not apply to the removal of a Team Lead assignment" and that, as the CBA provided, Plaintiff would instead be "placed in an interim position and must accept the first available open position . . . for which [she was] qualified[.]" Ruiz Decl. ¶ 13.

On April 17, Ms. Ruiz emailed Plaintiff "confirming that [Plaintiff] would be stepped down from her Team Lead role effective April 17, 2022." Ruiz Decl. ¶ 13; *see* Ruiz Decl., Ex. 6, Email April 17, 2022, ECF No. 15-6.

On April 22, Plaintiff attended an HR Compliance meeting with her union representative. SAC ¶ 14. Plaintiff alleged that "[t]he Union representative assured

Plaintiff that she was entitled to bumping rights and that management could not unilaterally eliminate her position." *Id.*

On May 3, Plaintiff was offered a non-interim or permanent "Imaging Assistant position[,]" which she accepted. Pl. Dep. 191:10–192:22; *see* Ruiz Decl., Ex. 7, Email May 3, 2022, ECF No. 15-7. Plaintiff's new position was comparable to her prior position but without the Team Lead pay differential. Pl. Dep. 238:05–09.

On May 20, Ms. Ruiz received "a complaint from another employee about [Plaintiff]." Ruiz Decl. ¶15. On June 20, Ms. Ruiz emailed Plaintiff: "We will need to schedule a meeting to investigate a concern brought forth by a co-worker." Ruiz Decl. ¶ 15; *see* Ruiz Decl., Ex. 9, Ruiz Email June 20, 2022, ECF No. 15-9. Plaintiff alleged that Ms. Ruiz informed Plaintiff that she "would be going through a Joint Discovery" because a coworker had complained that she "didn't feel comfortable around Plaintiff." SAC ¶¶ 15–16.

On June 22, Plaintiff had "a major mental breakdown" and "[was not] able to return to the workplace." SAC ¶ 17. Plaintiff then took a nine-month medical leave. *Id.*; Pl. Dep. 164:15–18. In March 2023, Plaintiff returned to work as an Imaging Assistant, Pl. Dep. 164:15–18, at a different Kaiser facility. Pl. Dep. 6:07–12; Ruiz Decl. ¶ 17. The joint discovery did not ever take place. Ruiz Decl. ¶ 17.

## DISCUSSION

Plaintiff brings three claims against Defendant: (1) breach of her Collective Bargaining Agreement ("CBA"); (2) retaliation, in violation of Oregon Whistleblower Law, ORS 659A.199; and (3) Intentional Infliction of Emotional Distress. *See* SAC.

I.    *Breach of the Collective Bargaining Agreement*

Plaintiff alleges that Kaiser breached her CBA when it (1) eliminated her position "without just cause or bargaining," SAC ¶ 29, and (2) denied her bumping rights, SAC ¶ 31.   Plaintiff brings a breach of contract claim under state law. Defendant argues that "[s]ection 301 of the Labor Management Relations Act ["LMRA"] preempts state law claims that require interpretation of a CBA," Def. Mot. at 10, and that Plaintiff's LMRA claim fails as a matter of law because Plaintiff "did not attempt to exhaust her remedies under the CBA," *id.* at 11.

Section 301(a) of the LMRA provides federal jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization . . . ." 29 U.S.C. § 185(a). "A suit for breach of a [CBA] is governed exclusively by federal law under section 301[.]"   *Newberry v. Pac. Racing Ass'n*, 854 F.2d 1142, 1146 (9th Cir. 1988) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 23, (1983)). When a state law claim "can be resolved only by referring to the terms of [a] bargaining agreement," that claim falls within the scope of section 301.   *Newberry*, 854 F.2d at 1146 (citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405–06 (1988)).

Here, Plaintiff alleges that Defendant breached the CBA by eliminating her Team Leader position and denying her bumping rights.   The CBA's Schedule A contains the relevant Team Leader provision.  Shaddy-Farnsworth Decl., Ex. 1, CBA, Schedule A, § A.3, "Team Leader" at 47.  Section A.3 also contains the bumping rights provision that applies to Team Leaders.   *Id.*

Because Plaintiff's breach of contract claim can be resolved only by referring to the CBA's terms, specifically § A.3's Team Leader and bumping rights provisions, Plaintiff's breach of contract claim is governed by section 301, not state law.

Under section 301, an employee must exhaust any CBA-provided administrative remedies before filing a lawsuit. *Soremekun*, 509 F.3d at 986–87; *United Paperwork Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 37 (1987) ("The courts have jurisdiction to enforce collective-bargaining contracts; but where the contract provides grievance and arbitration procedures, those procedures must first be exhausted and courts must order resort to the private settlement mechanisms without dealing with the merits of the dispute."). When a plaintiff fails to exhaust remedies under a governing CBA, the court must dismiss that plaintiff's section 301 claim. *Truex v. Garrett Freightlines, Inc.*, 784 F.2d 1347, 1354 (9th Cir. 1985).

Here, Article 22 of Plaintiff's CBA sets out the "Grievance Procedure" for "interpretation and/or application of [the CBA's terms]." CBA § 22.02 at 42. Section 22.07 provides that the employee or the Union has thirty days from the date of the event giving rise to the grievance to file that grievance. CBA § 22.07 at 43. The parties do not dispute that neither Plaintiff nor the Union failed to file a grievance as to the removal of Plaintiff from her Team Leader position or the denial of bumping rights. Pl. Dep. 180:05–181:20.

Plaintiff asserts that, as to her bumping rights, she is excepted from the exhaustion requirement because (1) she was on medical leave and "was not medically

able to grieve her bumping rights[,]" and (2) she relied on her union representative's statement that "she was eligible for bumping rights." Pl. Resp. at 10.

As to medical leave, Plaintiff provides no caselaw to support that medical leave excuses her from the exhaustion requirement. Further, Plaintiff reports that she was informed about the denial of her bumping rights on March 31, 2022. SAC ¶ 13. But she took medical leave on June 22, 2022, which was beyond the thirty-day grievance-filing window. *Id.* at ¶ 17. Plaintiff's medical leave would not have interfered with Plaintiff's ability to file a grievance.

Plaintiff also asserts that she is excepted from the exhaustion requirement because her union breached its duty of fair representation when it "confirmed that she was eligible for bumping rights." Pl. Resp. at 10–11; *see* SAC ¶ 14.

"An exception to the general requirement of exhaustion exists . . . where the employee demonstrates that 'the union representing the employee in the grievance/arbitration procedure [has acted] in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation.'" *Soremekun*, 509 F.3d at 986; *see also Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 567 (1976) ("The union's breach of duty relieves the employee of an express or implied requirement that disputes be settled through contractual grievance procedures.").

To invoke this exception, an employee must allege a "hybrid § 301/fair representation" claim in the complaint: one claim against the employer for breaching the CBA and another claim against the union for breaching its duty of fair

representation. *Soremekun*, 509 F.3d at 987 (collecting cases including *United Food and Comm. Food Workers, Loc. Union No. 7R v. Safeway Stores, Inc.*, 889 F.2d 940, 944 (10th Cir. 1989) ("Ordinarily, an employee must allege a breach of the duty of fair representation in order to avoid dismissal of his or her section 301 suit for failure to exhaust exclusive contractual remedies under the collective bargaining agreement").

In *Soremekun*, a plaintiff-employee brought a section 301 suit against his employer for violating the CBA's wage terms but failed to first file a grievance and exhaust his CBA's administrative remedies. *Soremekun*, 509 F.3d at 979, 987. Accordingly, his employer moved for summary judgment. *Id.* at 979. In response, the plaintiff-employee argued that he was excused from the exhaustion requirement because the Union "never gave him a copy of the CBAs, neglected to advise him of the need to file an official grievance form, and arbitrarily dismissed his complaints in violation of its duty of fair representation." *Id.* at 988. While acknowledging that a fair representation claim can provide an exception to the exhaustion requirement, the court granted employer's summary judgment motion because plaintiff-employee had not alleged a fair representation claim *in his complaint*. *Id.* ("[Employee] cannot now convert the action into 'a hybrid § 301/fair representation claim' by raising the argument for the first time in opposition to a summary judgment motion."). Here, as in *Soremekun*, Plaintiff failed to allege a fair representation claim against the union in her complaint and cannot now, at the summary judgment stage, avail herself of an exception to the administrative exhaustion requirement.

Even if Plaintiff had filed a grievance and timely exhausted her administrative remedies, she would not have prevailed on this claim because Defendant did not breach the CBA. The CBA provides that Defendant has exclusive say over "[t]he selection and removal of individuals assigned to [the Team Lead role]." CBA, § A.3, at 47. It also provides that a Team Leader "shall be established . . . where five or more Technologists are employed on a *predetermined* work schedule." *Id.* Plaintiff's team consisted of five employees, but one of them was an on-call, not a predetermined work schedule, employee. Pl. Dep. 27:08–21. Thus, Plaintiff's team had only four employees and did not require a Team Leader.

Finally, the CBA does not provide bumping rights for employees removed from Team Leader positions. Instead, it provides that "[a] Team Leader removed from his/her position by the Employer will be placed in an interim position until the first available opening in the appropriate position becomes available within [ninety] days of removal from the Team Leader position." CBA § A.3 at 47. As required by the CBA, when Plaintiff stepped down from her Team Leader position on April 17, she was placed in an interim position. Ruiz Decl. ¶ 13. And on May 3, she accepted a permanent imaging assistant position that was the same position she had had before but without the Team Leader responsibilities and the Team Leader pay differential. Pl. Dep. 191:10–192:22, 238:05–09.

In sum, section 301 governs Plaintiff's breach claim. There is no dispute that Plaintiff failed to file a grievance and exhaust her administrative remedies under the governing CBA. And there is no dispute that Plaintiff failed to allege a fair

representation claim in her complaint. She cannot now, at the summary judgment stage, avail herself of an exception to that exhaustion requirement. For these reasons, Defendant is entitled to summary judgment on Plaintiff's section 301 claim.

II. *Whistleblower Retaliation Claims*

Plaintiff alleges retaliation claims under Oregon Whistleblower Law, ORS 659A.199. Under the Whistleblower Law, it is unlawful for an employer to "demote, suspend or in any manner discriminate or retaliate against an employee" as to "promotion, compensation or other [employment] terms, conditions or privileges" when an employee "has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation." ORS 659A.199(1).

Oregon Whistleblower claims are analyzed like Title VII retaliation claims. *Neighorn v. Quest Health Care*, 870 F. Supp. 2d 1069, 1102 (D. Or. 2012); *see generally* 42 U.S.C. § 2000e *et seq*. To make a *prima facie* retaliation case, a plaintiff must allege that (1) plaintiff "engaged in a protected activity;" (2) plaintiff suffered an "adverse employment action;" and (3) "a causal link exists between the protected activity and the adverse action." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). If a plaintiff makes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate non-retaliatory reason for the adverse action. *Id*. If the defendant articulates a legitimate non-retaliatory reason for the action, the burden shifts back to plaintiff to show that the reason was merely a pretext for a retaliatory motive. *Id*.

A.    *Four Adverse Employment Actions*

Here, Plaintiff alleges that in retaliation for "reporting information that she reasonably believed was evidence of state or federal law, rule, or regulation[,]" she suffered adverse employment actions including: (1) downgraded performance review, (2) removal from the Team Lead position when that position was eliminated, (3) denial of bumping rights, and (4) "months of harassment" from Kaiser employees, including by management.  SAC ¶¶ 17, 20; Pl. Resp. at 12–13, 16.

The parties do not dispute that Plaintiff engaged in protected activity when she filed complaints about staffing and patient care deficiencies.  But Defendant asserts that Plaintiff's whistleblower claims are time barred because, under ORS 659A.199, whistleblower actions must be commenced within one year after the date of the alleged unlawful employment practice.  Def. Mot. at 14; ORS 659A.875(1)(a) ("A civil action . . . alleging an unlawful employment practice other than a violation of ORS 243.323, 659A.030, 659A.082, 659A.112 or 659A.370 must be commenced within one year after the occurrence of the unlawful employment practice unless [an administrative] complaint has been timely filed under ORS 659A.820.").

In Oregon, ORS 12.020 determines when an action commenced.  If a summons is served within 60 days of a complaint's filing, the action "commenced" on the date the complaint was filed. ORS 12.020(2).  But if a summons is served more than 60 days after a complaint's filing, the action "commenced" on the date the summons was served.  ORS 12.020(1).

Here, Plaintiff filed her Complaint on March 29, 2023, but she did not serve Defendant until 63 days later, on May 31, 2023. Shaddy-Farnsworth Decl. ¶¶ 3–4, ECF No. 14; *see also* ECF. No. 1-2 & 1-3. Because the summons was served more than 60 days after the Complaint was filed, the Plaintiff's action commenced on the date the summons was served, May 31, 2023. Given the Whistleblower Law's one-year statute of limitations, any adverse action that happened more than a year earlier, that is, before June 1, 2022, is time barred.

Three of the alleged adverse employment actions occurred before June 1, 2022: (1) the downgraded performance review on March 3, 2022, SAC ¶ 10; (2) the elimination of Plaintiff's Team Lead position on March 31, 2022, SAC ¶ 12; (3) denial of Plaintiff's bumping rights on March 31, 2022, SAC ¶ 13. Plaintiff's retaliation claims based on these adverse employment actions are time barred. But one of the alleged adverse employment actions occurred after June 1, 2022—the decision to conduct a joint discovery, which occurred on June 20, 2022. The retaliation claim based on the June 20 action is not time barred.

B.    *Decision to Conduct a Joint Discovery*

Defendant argues that its decision to conduct a joint discovery is not an adverse action. Def. Mot. at 16. "[A]n adverse employment action is adverse treatment that is reasonably likely to deter employees from engaging in protected activity." *Ray*, 217 F.3d at 1237. The Ninth Circuit "take[s] an expansive view of the type of actions that can be considered adverse employment actions." *Id.* at 1241 (collecting cases). To qualify as an adverse employment action, the action need not be severe. *Coszalter v.*

*City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003). Rather, "the severity of the action ultimately 'goes to the issue of damages, not liability.'" *Aichele v. Blue Elephant Holdings, LLC*, 292 F. Supp. 3d 1104, 1111 (D. Or. 2017) (quoting *Ray*, 217 F.3d at 1243). "Adverse employment actions include 'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations[,] and toleration of harassment by other employees.'" *Ray*, 217 F.3d at 1241 (quoting *Wyatt v. City of Boston*, 35 F.3d 13, 15–16 (1st Cir. 1994)).

Defendant states that on June 20, 2022, Ms. Ruiz asked Plaintiff to "participate in a [joint discovery] meeting to investigate concerns raised by a coworker[.]" Def. Mot. at 18. A "joint discovery" is a "process" that starts with a meeting between "Kaiser, the employee, and the employee's union and sometimes human resources" to "look into employee performance concerns[] . . . before deciding whether corrective action is appropriate." Wyllie Decl. ¶ 10. Defendant argues that the joint discovery is not an adverse action because a joint "collaborative" investigation is not adverse, because a "mere request" for a discovery is not sufficiently "concrete," and because the joint discovery never happened. Def. Mot. at 17. The Court is skeptical that an invitation from an employer to an employee to participate in an investigation of that employee's conduct is viewed as genuinely "collaborative" or as a "request," which implies that it is optional.

The Court agrees that the meeting itself, because it did not happen, is not an adverse employment action. But viewing the evidence in the light most favorable to Plaintiff, and, given the Ninth Circuit's expansive definition of adverse employment

action, the Court concludes that the *decision* to conduct and initiate a process to investigate an employee's conduct is an adverse action. Plaintiff alleges that "after months of harassment and retaliation from Defendants and Ruiz[,]" and two days after Ms. Ruiz told her that she "would be going through a Joint Discovery[,]" Plaintiff "had a major mental breakdown and has not been able to return to the workplace." SAC ¶¶ 15–17, 20; *see also* Pl. Resp. at 5, 13, 16. Given this context, the Court concludes that the decision to conduct a joint discovery is an action likely to deter employees from engaging in protected activity, and is therefore, an adverse employment action.

To make a *prima facie* case of retaliation, Plaintiff must show that Defendant's decision to investigate her conduct was based on a retaliatory motive, that is, Plaintiff must show that Defendant's decision to conduct a joint discovery was caused by the complaints she filed four months earlier. "A plaintiff may satisfy the causation element [of a retaliation claim] through 'circumstantial evidence, such as the employer knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision.'" *Lindsey v. Clatskanie People's Util. Dist.*, 140 F. Supp. 3d 1077, 1088 (D. Or. 2015) (quoting *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)); *Ray*, 217 F.3d at 1244 (The causal link "may be inferred from proximity in time between the protected action and the allegedly retaliatory employment decision.") (internal quotation marks and citation omitted); *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (explaining that "in some

cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.") (collecting cases); *Coszalter*, 320 F.3d at 977–78 ("[T]hree to eight months is easily within a time range that can support an inference of retaliation. . . . For a variety of reasons, some retaliators prefer to take their time: They may wait until the victim is especially vulnerable or until an especially hurtful action becomes possible.")

Here, approximately four months after Plaintiff filed staffing and patient care complaints, and after a series of other adverse employment actions, Plaintiff was told that she "would be going through a Joint Discovery." SAC ¶ 15. Plaintiff's manager, Ms. Ruiz, knew that Plaintiff had reported deficiencies because Ms. Ruiz attended the meeting in which Plaintiff brought those deficiencies to management's attention. It was Ms. Ruiz who decided to eliminate Plaintiff's position, moved Plaintiff to the interim position, presented permanent position options to Plaintiff, and participated in the decision to conduct a joint discovery. Given the timing, the series of adverse actions that followed on the heels of Plaintiff's complaints, and Ms. Ruiz's central role in these actions, the Court concludes that Plaintiff makes a *prima facie* case of retaliation.

The burden then shifts to Defendant to articulate a "legitimate non-retaliatory reason" for deciding to conduct a joint discovery. Ms. Ruiz testified that the decision to conduct a joint discovery resulted from a May 20, 2022 email she had received from another employee who reported "concerns" about Plaintiff. Ruiz Decl. ¶¶ 15, 16. In that email, the coworker stated: "[F]rankly I am afraid of [Plaintiff]. . . . [She] has

done her best to create a chaotic and hostile work environment for me[,]" and "is allowed to bully, harass, and make . . . inflammatory statements . . . so regularly, against coworkers, and management. . . . I cannot work like this." Ruiz Decl., Ex. 8, Coworker Email May 20, 2022, ECF No. 15-8.

After receiving the email, Ms. Ruiz "advised [the employee to] reach out to HR regarding her concerns." Ruiz Decl. ¶ 15. A month later, on June 20, 2022, Ms. Ruiz consulted Ms. Wyllie, Kaiser's Senior Employee & Labor Relations Consultant. Ruiz Decl. ¶ 16; Wyllie Decl. ¶ 11. Ms. Wyllie testified that she was involved in the decision to schedule a joint discovery meeting and that she "agreed with [Ms. Ruiz] that a joint discovery meeting was the appropriate next step to investigate concerns brought forth by another employee about [Plaintiff's] behavior." Wyllie Decl. ¶ 11. Ms. Wyllie explained that the joint discovery is Defendant's "process" to "look into employee performance concerns[]" and "engages all participants to "conduct interviews and gather evidence before deciding whether corrective action is appropriate." *Id.* at ¶ 10. After consulting Ms. Wyllie, Ms. Ruiz "sent [Plaintiff] an email requesting to schedule a joint discovery meeting to investigate a complaint [she] had received from [Plaintiff's] coworker[.]" Ruiz Decl. ¶ 16; *see* Ruiz Decl., Ex. 9, Email June 20, 2022.

Plaintiff counters that Defendant's reason for its actions is a pretext. Pl. Resp. at 16. "To show pretext, the plaintiff is not necessarily required to introduce evidence beyond that already offered to establish her *prima facie* case[.]" *Miller v. Fairchild Ind.*, 797 F.2d 727, 732 (9th Cir. 1986) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.10 (1981)). Here, Plaintiff provides no additional evidence to

show that Defendant's reason is a pretext. She provides no evidence that Defendant's joint discovery policy was applied selectively or differently to her or that Defendant had an different way to investigate a coworker conflict.  *See Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 798 (9th Cir. 1982) ("[Plaintiff] was . . . required to prove that [defendant] acted, at least in part, with a retaliatory intent or motive[,]" and not "in fact purely to implement a legitimate business policy[.]").

Viewing the evidence in the light most favorable to Plaintiff and drawing all inferences in Plaintiff's favor, the Court determines that Plaintiff does not establish a retaliatory motive because she does not rebut Defendant's reason for deciding to conduct a joint discovery.  The decision to implement joint discovery (a preexisting policy designed to investigate employee concerns) was triggered by a third party—the coworker.  The coworker reported serious concerns that Defendant was obligated to address.  Ms. Ruiz waited one month before consulting Ms. Wyllie and deciding to proceed with discovery.  Plaintiff provides no evidence that Defendant applied the joint discovery policy selectively to her or had a different way to address coworker conflicts.

In sum, Defendant is entitled to summary judgment on any time-barred retaliation claims, that is, the three claims that arose from the alleged adverse employment actions that occurred in March and April of 2022 (the downgraded performance review, elimination of plaintiff's position, and denial of bumping rights). Defendant is also entitled to summary judgment on the fourth retaliation claim, the June 20, 2022 decision to conduct a joint discovery.  Defendant provides a legitimate

non-retaliatory reason for deciding to conduct a joint discovery in response to a coworker complaint, and Plaintiff provides no evidence to support her allegation of pretext. Without more, a reasonable factfinder could not conclude that Defendant acted with retaliatory intent when it decided to conduct a joint discovery to investigate a coworker complaint and did so according to its policy. Defendant is therefore entitled to summary judgment on the retaliation claim.

III.    *Intentional Infliction of Emotional Distress ("IIED") Claim*

Plaintiff's IIED claim alleges that she had a "special employer-employee relationship with Defendant[,]" SAC ¶ 23, that Defendant "knew, or should have known, that [its] conduct . . . would cause severe mental or emotional distress to Plaintiff[,]" SAC ¶ 24, and that "Defendant's conduct toward Plaintiff was extreme and outrageous in light of their special employer-employee relationship[,]" SAC ¶ 25.

An IIED claim must allege "(1) that defendants intended to cause plaintiff severe emotional distress or knew with substantial certainty that their conduct would cause such distress; (2) that defendants engaged in outrageous conduct, *i.e.,* conduct extraordinarily beyond the bounds of socially tolerable behavior; and (3) that defendants' conduct in fact caused plaintiff severe emotional distress." *House v. Hicks*, 218 Or. App. 348, 357–58 (2008). "Because proof of intent is often indirect . . . proof of this tort largely turns on the second element, whether a defendant's conduct is sufficiently outrageous." *Id.* at 358.

Defendant asserts that Plaintiff's IIED claim fails as a matter of law because Plaintiff cannot show that Defendant's conduct was "sufficiently outrageous to be

actionable[,]" Def. Mot. at 22, or that Defendant acted with the "requisite intent" or knowledge, *id.* at 23–24.

Under Oregon law, "a trial court plays a gatekeeper role in evaluating the viability of an IIED claim by assessing the allegedly tortious conduct to determine whether it goes beyond the farthest reaches of socially tolerable behavior and creates a jury question on liability." *House*, 218 Or. App. at 358. Extreme and outrageous conduct is a high bar that "exceeds any reasonable limit of social toleration[.]" *Id.* Whether conduct is an "extraordinary transgression" is a case-by-case fact-specific inquiry based on the totality of the circumstances. *Id.*

To determine whether conduct is extreme and outrageous, a court must examine the conduct's "character and context[.]" *Id.* at 360. "The most important [contextual] factor is whether a special relationship exists between a plaintiff and a defendant, such as an employer-employee . . . that shapes the interpersonal dynamics of the parties." *Id.* Such a special relationship "imposes on the defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arm's-length encounters among strangers." *McGanty v. Staudenraus*, 321 Or. 532, 547–48 (1995).

Here, the parties do not dispute that a special employer-employee relationship existed when Plaintiff's claim arose. In that context, Plaintiff alleges that she suffered a series of adverse events including downgraded performance review, elimination of her job, and months of harassment including a decision to require joint discovery to examine her conduct. She alleges that "Defendant systematically forced

Plaintiff to work in an environment where lack of meeting the standard of care was to be accepted[,]" Pl. Resp. at 17; that she was told it was "normal" to delay or not respond to medical orders and "fine" to not comply with wage and hour laws, *id.* at 18; that "she was harassed for continuing to bring the breaches to the attention of management[,]" *id.*; and that she "was severely emotional[ly] distressed that her employer was actively disregarding patient care and the wage and hour laws[,]" *id.* Plaintiff asserts that it "exceeds the bounds of what is socially tolerable" for "an employer to require an employe[e] to look the other way." *Id.*

The question is whether, given the special employer-employee relationship, the alleged conduct rises to the level of being extreme and outrageous under Oregon Law. Oregon courts have determined that "the illegality of conduct is relevant to, but not determinative of, whether the conduct is sufficiently outrageous to support an IIED claim." *House*, 218 Or. App. at 359. Oregon courts have also determined that, within the employer-employee relationship, employer conduct that is "only aggravating, insensitive, petty, irritating, perhaps unlawful, and mean" is not "extreme and outrageous." *Clemente v. State*, 227 Or. App. 434, 442–43 (2009); *see also Snyder v. Sunshine Dairy,* 87 Or. App. 215, 218 (1987) (Managerial conduct such as "excessive supervision and unjustified reprimands, even if proved, cannot amount to an extraordinary transgression of the bounds of socially tolerable conduct.") (internal quotation marks and citation omitted). In contrast, IIED claims that typically survive summary judgment include an aggravating factor such as an "employer who engaged in, or credibly threatened to engage in, unwanted physical contact of a sexual

or violent nature." *Clemente*, 227 Or. App. at 443*; see also Zeggert v. Summit Stainless Steel, LLC*, 3:13-cv-00016-PK, 2014 WL 3512497, at *7 (D. Or. Jul. 10, 2014) (collecting cases in which employers "repeatedly used derogatory racial, gender, or ethnic slurs, usually accompanied by some other aggravating circumstance" or "exposed the plaintiff to actual physical danger.").

Viewing the evidence in the light most favorable to Plaintiff and drawing all inferences in Plaintiff's favor, the Court finds that Defendant's conduct does not exceed "the farthest reaches of socially tolerable behavior." *House*, 218 Or. App. at 358. At worst, Defendant's conduct may have been aggravating, insensitive, petty, irritating, and perhaps retaliatory and unlawful, but Oregon courts have determined that such employer conduct does not exceed the bounds of social toleration. Defendant is therefore entitled to summary judgment on the IIED claim.

## CONCLUSION

For the reasons explained, the Court GRANTS Defendant's Motion for Summary Judgment, ECF No. 13. The case is DISMISSED.

It is so ORDERED.

DATED this  24th  day of March 2025.


 /s/Ann Aiken
ANN AIKEN
United States District Judge